# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY | ) | |
| INFORMATION CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-776 (BAH) |
| | ) | |
| U.S. DEPARTMENT | ) | |
| OF THE ARMY, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,  Defendant hereby moves for summary judgment because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.  In support of this motion, Defendant respectfully submits the attached memorandum of points and authorities, statement of material facts not in genuine dispute, proposed order and declarations.

Respectfully submitted,

VINCENT H. COHEN, JR,   D.C. Bar #471489
Acting United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

BY: _____/s/_____
WAYNE H. WILLIAMS
Special Assistant U.S. Attorney
555 Fourth Street, NW
Washington, D.C. 20530
(202) 252-2574
wayne.williams@usdoj.gov

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| ELECTRONIC PRIVACY ) | |
| INFORMATION CENTER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 14-776 (BAH) |
| ) | |
| U.S. DEPARTMENT ) | |
| OF THE ARMY, ) | |
| ) | |
| ) | |
| Defendant ) | |

---

## <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT</u>
## <u>OF ITS MOTION FOR SUMMARY JUDGMENT</u>

## <u>INTRODUCTION</u>

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended. Plaintiff, through FOIA, requested documents related to the Joint Land Attack Cruise Missile Defense Elevated Netted Senor System (JLENS). *See* Def. Exh. A, Admin Record (AR) at 1-4. Plaintiff requested all JLENS contracts and statements of work (SOW); instructions, policies, and procedures concerning use of the JLENS to collect, store, and transmit, retain, degrade, or delete images and sounds; JLENS technical specifications of visual and auditory surveillance hardware; and contracts and SOW for JLENS hardware, software, or training concerning the ability of the JLENS to collect, obscure, degrade, store, transmit, reproduce, retain or delete images and sounds. *Id*. at 3.

The JLENS is comprised of multiple components to include a fire control radar system and a wide-area surveillance radar system.  Def. Exh. D, Thurgood Decl. ¶ 6.  Each system consists of a tethered areostat, a mobile mooring station, a radar, a data communications and control group, and other affiliated ground support equipment.  *Id.*  The JLENS provides persistent radar surveillance and tracking capabilities to defend against aerial vehicle and cruise missile threats.  *Id.* ¶ 7.  Through the use of advanced radar and network technology, the JLENS provides 360-degree, wide-area protection against these threats.  *Id.*  The system further will provide important capabilities to help detect, track and respond to hostile threats.  *Id.*

On November 11, 2013, EPIC received a letter from the Army, confirming receipt of EPIC's FOIA request. Compl. ¶ 23, ECF No. 1 (hereinafter "Compl."); Def. Exh. A, AR 11-13.  EPIC's FOIA Request was forwarded to the U.S. Army Space and Missile Defense/Army Forces Strategic Command, and to the CSTE-SG/FOIA Officer, Secretary of the General Staff, U.S. Army Test and Evaluation Command, 2202 Aberdeen Boulevard.  Compl. ¶ 23; Def. Exh. A, AR 11-13.  EPIC's FOIA request was submitted to these offices as they were identified likely to have responsive records for review.  Def. Exh. A, AR 11-13

On February 6, 2014, EPIC filed an administrative appeal with the Army, for failure to make a timely determination under FOIA.  Compl. ¶ 25; Def. Exh. A, AR 7-9; Def. Exh. J, Bolling Decl. ¶ 6.  On 10 February 2014, EPIC's FOIA Appeal was forwarded to U.S. Army Space and Missile Defense/Army Forces Strategic Command, and CSTE-SG/FOIA Officer, Secretary of the General Staff, U.S. Army Test and Evaluation Command.  Def. Exh. J, Bolling Decl. ¶ 6.

Following Plaintiff filing suit, the appropriate FOIA offices (Army Contracting Command (ACC-RSA)/USAG-RSA) were identified that would likely have documents responsive to the request. Def. Exh. I, Allen Decl., ¶ 10. Once the request was forwarded to Redstone Arsenal, three different custodian organizations within the installation began processing Plaintiff's FOIA request. *Id*. ¶¶ 11-12. In total, these organizations have identified approximately 5632 pages of records responsive to the request and processed them for release through FOIA. *Id*. ¶ 25. Because of the sensitive nature of the JLENS program, many of the documents processed for release contain classified information, or other information protected from disclosure by statute. *See* Def. Exh. B, Howard Decl., ¶¶ 28, 37; Def. Exh. D, Thurgood Decl., ¶¶ 11-22. Accordingly, extensive security reviews were employed to protect against inadvertent disclosure of classified information or other sensitive technical data. *See e.g*. Exh. B, Howard Decl., ¶ 37. The documents also contained personal information the release of which would result an unwarranted invasion of personal privacy. Def. Exh. B, Howard Decl., ¶¶ 301 32; Def. Exh. E, Ashley Decl., ¶¶ 32-33; Def. Ex. G, Vickerstaff Decl., ¶¶ 29, 30. Additionally, defense contractors Raytheon and deciBel Research, submitted protected trade secret, commercial, and/or financial data when soliciting their respective contracts and such information was entitled to protection from disclosure. Def. Exh. E, Ashley Decl., ¶¶ 26-30; Def. Exh. G, Vickerstaff Decl., ¶¶ 25-27. The FOIA office and Army Contracting Command-CAMO at Redstone Arsenal coordinated with these defense contractors to limit the scope of any information withheld. Def. Exh. E, Ashley Decl., ¶ 27; Def. Exh. G, Vickerstaff Decl., ¶ 25.

In total, twenty-one documents have been identified as responsive to Plaintiff's FOIA request:

4

1.  Interactive Electronic Technical Publication: High Speed Recorder Power On – Normal Operation Procedures (10 pages);

2.  Interactive Electronic Technical Publication: Start Data Recording – Normal Operation Procedures (10 pages);

3.  Interactive Electronic Technical Publication:  Voice Recorder – Equipment Description and Data (10 pages);

4.  JLENS Performance Specification for Spiral 1 (11 pages);

5.  JLENS Fire Control Radar (FCR) Prime Item Description Specifications (PIDS) (274 pages);

6.  JLENS FCR PIDS Annex A (31 pages);

7.  JLENS FCR PIDS Annex B (43 pages);

8.  JLENS Platform PIDS (139 pages);

9.  JLENS Surveillance Radar PIDS (233 pages);

10.  JLENS Communications and Processing Group (CPG) PIDS (243 pages);

11.  JLENS CPG PIDS Appendix B (103 pages);

12.  JLENS CPG PIDS Annex B (14 pages);

13.  JLENS CPG PIDS Annex A (13 pages);

14.  JLENS Performance Specification (135 pages);

15.  JLENS Performance Specification Annex A (10 pages);

16.  The JLENS System Design and Demonstration Contract with Raytheon (DASG60-98-C-0001) (2896 pages);

17.  The JLENS System Design and Demonstration Contract with Raytheon (W9113M-09-C-0202) (53 pages);

18.  The JLENS System Design and Demonstration Contract with Raytheon (W9113M-12-C-0005) (115 pages);

19.  The JLENS System Design and Demonstration Contract with Decibel Research (W9113M-11-C-0054) (76 pages);

20.  The JLENS System Design and Demonstration Contract with Decibel Research (W9113M-05-C-0128) (222 pages);

21.  The JLENS Engineering Services Contract with Raytheon (W31P4Q-10-C-0003) (991 pages).

Def. Exh. A, AR at 36-39; Def. Exh. I, Allen Decl. ¶ 25.

## STATEMENT OF FACTS

Defendant respectfully refers the Court to the Statement of Material Facts which are not in dispute filed herewith.

## ARGUMENT

### A.    Standard of Review

#### 1.    Summary Judgment Generally

Where no genuine dispute exists as to any material fact, summary judgment is required. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A genuine issue of material fact is one that would change the outcome of the litigation.  *See id*.  "The burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court] – that there is an absence of evidence to support the non-moving party's case."  *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Thus, to avoid summary judgment here, Plaintiff must present some objective evidence that would enable the

Court to find that he is entitled to relief.  In *Celotex Corp. v. Catrett*, the Supreme Court held

that, in responding to a proper motion for summary judgment, the party who bears the burden of

proof on an issue at trial must "make a sufficient showing on an essential element of [his] case"

to establish a genuine dispute.  477 U.S. 317, 322-23 (1986).  In *Anderson*, the Supreme Court

further explained that "the mere existence of a scintilla of evidence in support of the Plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for

the Plaintiff."  *Anderson*, 477 U.S. at 252; *see also Laningham v. Navy*, 813 F.2d 1236, 1242

(D.C. Cir. 1987) (establishing that the non-moving party is "required to provide evidence that

would permit a reasonable jury to find" in its favor).  In *Celotex*, the Supreme Court further

instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

designed 'to secure the just, speedy and inexpensive determination of every action.'"  477 U.S. at

327 (quoting Fed. R. Civ. P. 1).

### 2.      Summary Judgment in FOIA Cases

The summary judgment standards set forth above also apply to FOIA cases, which

"typically and appropriately are decided on motions for summary judgment."  *Defenders of*

*Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  In a FOIA suit, an agency

is entitled to summary judgment once it demonstrates that no material facts are in dispute when

viewing the facts in the light most favorable to the non-moving party.  *See Founding Church of*

*Scientology of Washington, D. C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979).

The moving party must show that each document that falls within the class requested either has

been produced, not withheld, is unidentifiable, or is exempt from disclosure.  *See Exxon Corp. v.*

*F. T. C.*, 663 F.2d 120, 126 (D.C. Cir. 1980) (holding that an index of documents and two affidavits describing the search as well as which documents were produced and which were exempt was sufficient for the Commission to prevail on a summary judgment motion).

An agency satisfies the summary judgment requirements in a FOIA case by providing the Court and the Plaintiff with affidavits or declarations and other evidence which show that the documents in question were produced or are exempt from disclosure.  *See Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 353 (D.C. Cir. 1978) (holding that an affidavit that provides "detailed descriptions of the searches undertaken, and a detailed explanation of why further searches would be unreasonably burdensome" is sufficient for the Agency to win on a motion for summary judgment); *McGehee v. Cent. Intelligence Agency*, 697 F.2d 1095, 1102 (D.C. Cir. 1983) (affirming that the district court may "rely upon affidavits submitted by the agency, describing its search procedures and explaining why a more thorough investigation would have been unduly burdensome"); *Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 67 (D.D.C. 2001) (reiterating that summary judgment in FOIA cases may be awarded solely on the basis of agency affidavits "when the affidavits describe 'the documents and the justifications for non-disclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'") (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

### B.     The Army Conducted an Adequate and Reasonable Search

To prevail in a FOIA case, a plaintiff must show that an agency has "(1) 'improperly' (2) 'withheld' (3) 'agency records.'"  *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136,

142 (1989), (quoting *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150

(1980)); *see* 5 U.S.C. § 552(a)(4)(B).  Upon receipt of a FOIA request, agencies must conduct a

search that is "reasonably calculated to uncover all relevant documents."  *Weisberg v. Dep't of*

*Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  The adequacy of a search is, however,

"dependent upon the circumstances of the case," *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C.

Cir. 1990), and is measured by "the reasonableness of the [agency's] effort in light of the specific

request."  *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986).  Therefore, an agency must

simply make "a good faith effort to conduct a search for the requested records using methods

which can reasonably be expected to produce the information requested." *Oglesby v. Dep't of the*

*Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

    To demonstrate the adequacy of its search, the agency must provide the Court with

"affidavits of responsible agency officials which are relatively detailed, non-conclusory, and

submitted in good faith."  *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 12–13 (D.D.C.

1998).  If the affidavits' description of the search establishes that the agency conducted an

adequate search, then summary judgment is appropriate.  *See Steinberg v. Dep't of Justice*, 23

F.3d 548, 552 (D.C. Cir. 1994); *see also, e.g.*, *Oglesby*, 920 F.2d at 68; *Weisberg*, 705 F.2d at

1351.  Furthermore, it is well established that agency declarations are "accorded a presumption

of good faith, which cannot be rebutted by 'purely speculative claims about the existence and

discoverability of other documents.'"  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (quoting *Ground Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C.Cir. 1981)).  "[A

requester's challenge requires that he present evidence rebutting the agency's initial showing of a

good faith search," and hypothetical assertions are insufficient.  *Callaway v. United States Dep't*

*of Treasury*, 893 F. Supp. 2d 269, 273 (D.D.C 2012); *see also Oglesby*, 920 F. 2d at 67 n.13

(stating that hypothetical assertions are insufficient).  Therefore, unless the Plaintiff can identify

"evidence sufficient to put the Agency's good faith into doubt," summary judgment should be

granted in favor of Defendants.  *Ground Saucer Watch*, 692 F.3d at 771.

<h4 style="text-align:center">1.     JLENS Product Office Search</h4>

The FOIA office at Redstone Arsenal identified three separate offices likely to have

information responsive to Plaintiff's FOIA request pertaining to the JLENS system.  Def. Exh. I,

Allen Decl., ¶ 10.  The Army Contracting Command-Contract Acquisition Management Office

(CAMO) was identified as the primary custodian for the procurement documents related to the

JLENS program.  *Id*. ¶ 10.  Army Contracting Command - The United States Air and Missile

Defense Office (ACC-AMD) was identified as the primary custodian of the engineering services

contracts.  *Id*. ¶ 10.  The Program Executive Office, Missiles and Space (PEO MS) was identified

as the primary custodian for the technical specification documents related to the JLENS program.

*Id*. ¶ 11.

Upon receiving Plaintiff's FOIA request from the Redstone Arsenal FOIA office, the

JLENS Product Office developed a plan and began its search for responsive records.  Def. Ex. B,

Howard Decl. ¶ 5.  The JLENS Product Office Systems Engineering team was directed to begin

a search for relevant documents.  *Id*. ¶ 6.  This team was identified because of its expertise with

the JLENS system and because of the technical nature of the JLENS program and the FOIA

request.  *Id*.  The JLENS Product Office Systems Engineering team generated keywords used

when searching the relevant computer networks.  *Id*. ¶ 7.  Specifically, the team searched the

computer networks with the terms "performance", "specification", "mission", "requirement",

"hardware", "software", "sw", "hw", "spiral", and "aerostat".  *Id*.  The JLENS Product Office Systems Engineering team also searched JLENS security containers for hard copies of documents and for electronic media within those containers for documents that might be responsive to Plaintiff's FOIA request.  *Id*.   The documents located were further searched with the keywords, "EO/IR", "video", "audio", and "recording", to determine whether they contained additional information responsive to Plaintiff's FOIA request.  *Id*.

The JLENS Product Office previously was organized under the Space and Missile Defense Command.  Def. Exh. B., Howard Decl., ¶ 8.  Accordingly, the JLENS Product Office Systems Engineering team conducted searches of the Space and Missile Defense Command's security containers in an effort to locate any documents responsive to Plaintiff's FOIA request. *Id*.  This search yielded no additional responsive JLENS information.  *Id*.

In total the JLENS Product Office has located fifteen documents responsive to Plaintiff's FOIA request.  *Id*. ¶ 10.  Ten of the located documents contained classified information.  *Id*.  The initial search located two documents:  (1) The JLENS Performance Specification; and (2) Annex A.  *Id*. The JLENS Performance Specification was processed and released pursuant to FOIA in August of 2014.  *Id*. ¶ 11.  Annex A to the Performance Specification was withheld in its entirety because it is classified.  *Id*.

In September 2014, the JLENS Product office identified three additional responsive documents.  *Id*. ¶ 12.  The documents identified were three JLENS Interactive Electronic Technical Publications: (1) High Speed Recorder Power On—Normal Operation Procedures; (2) Start Data Recording—Normal Operations Procedures; and (3) Voice Recorder—Equipment

Description and Data.  *Id*.  These documents were processed and released through FOIA.  *Id*. ¶ 12.

Plaintiff, following Defendant's production of documents through FOIA, inquired about two specific documents referenced but not included in the release.  *Id*., Attachment 2, ¶ 5.  The JLENS Product Office followed up on this inquiry by conducting an additional search.  *Id*. ¶ 10; Attachment 2, ¶5.  The office located the JLENS Performance Specification for Spiral 1 and processed the document for release in November 2014.  *Id*. ¶ 13, Attachment 2, ¶ 5.  Despite its diligent efforts, the JLENS Product Office was unable to locate the second document, referenced as the Aerostat Performance Specification.  Def. Exh. B, Howard Decl., Attachment 2, ¶ 5.

Following its search and processing of the JLENS Performance Specification for Spiral 1, the JLENS Product Office refined its search parameters based on its newly informed understanding of what constituted an agency record.  *Id*., Attachment 2, ¶ 6.  As a result of this new understanding, the JLENS Product Office determined that the JLENS Prime Item Description Specifications should be processed and released through FOIA.  *Id*.  In November 2014, the JLENS Product Office identified 9 additional responsive documents.  Def. Exh. B, Howard Decl., ¶ 10; Attachment 2, ¶ 6.  These documents were the; JLENS FCR PIDS; JLENS FCR PIDS Annex A; JLENS FCR PIDS Annex B (Withheld); JLENS Platform PIDS; JLENS Surveillance Radar (SuR) PIDS; JLENS Communications and Processing Group (CPG) PIDS; JLENS CPG PIDS Appendix B; JLENS CPG PIDS Annex A (Withheld); and JLENS CPG PIDS Annex B (Withheld).  *Id*. ¶¶ 10, 14; Attachment 2, ¶ 6.  These documents were processed and released pursuant to FOIA in January 2015.  *Id*. ¶ 14; Attachment 2, ¶ 7.

### 2.     Army Contracting Command-Contracting and Acquisition Management Office

The Army Contracting Command-Contracting and Acquisition Management Office (CAMO) received a request for the Redstone Arsenal FOIA office to search its offices for responsive records.  Def. Ex. E, Ashley Decl., ¶ 4.  The Army Contracting Command-CAMO office was determined to likely contain contracting documents related to contracts and statements of work pertinent Plaintiff's FOIA request.  Dec. Ex. I, Allen Decl., ¶ 10.

The Army Contracting Command-CAMO searched for all contracts and contract modifications related to the JLENS program. Def. Ex. E, Ashley Decl., ¶ 4.  The office physically searched 462 shelves that contained paper files physically located in the contracts office.  *Id*. ¶ 5.  Additionally, a web-based U.S. Government information system, Paperless Contract Files, was identified as potentially containing responsive documents.  *Id*.  The search yielded five JLENS related contracts.  *Id*.  Of these five contracts, three were awarded to Raytheon and two of them were awarded to deciBel Research.  *Id*. ¶ 7.  Each contract was reviewed for completeness, starting with the basic contract and continuing through each modification.  *Id*. ¶ 8.  This process was aimed to locate the contract award documents and all contract attachments related to the five overall contracts.  *Id*.

The search conducted by Army Contracting Command-CAMO yielded a total of 5 JLENS related contracts.  Three contracts were awarded to Raytheon and two contracts were awarded to deciBel Research.  Def. Exh. D, Ashley Decl., ¶ 7.  The contracts located were:  (1) The JLENS System Design and Demonstration Contract with Raytheon (DASG60-98-C-0001); (2) The JLENS System Design and Demonstration Contract with Raytheon (W9113M-09-C-0202); (3) The JLENS System Design and Demonstration Contract with Raytheon (W9113M-

13

12-C-0005); (4) The JLENS System Design and Demonstration Contract with deciBel Research (W9113M-11-C-0054); and (5) The JLENS System Design and Demonstration Contract with deciBel Research (W9113M-05-C-0128). *Id*. ¶ 7. Each of the contracts were processed and released to Plaintiff in accordance with FOIA. *Id*. ¶¶ 15-18.

### 3. Army Contracting Command-Air and Missile Directorate

Additionally, the Redstone Arsenal FOIA office sent Plaintiff's FOIA request to Army Contracting Command-Air and Missile Directorate (AMD). Def. Exh. G, Vickerstaff Decl., ¶¶ 2, 4. Army Contracting Command-AMD was identified as a possible custodian of contract documents relating to contract development because Army Contracting Command-AMD administered the JLENS engineering services contract. *Id*. ¶ 6.

Army Contracting Command-AMD searched three shelves of paper files for contracts and their modifications or amendments and also it searched the web-based U.S. Government information system, Paperless Contract Files. *Id*. ¶ 6. The search of the record system yielded a single contract document: W31P4Q-10-C-0003. *Id*. Overall the search conducted by Army Contracting Command-AMD located one JLENS related contract that was awarded to Raytheon. *Id*. This contract was processed and released to the Plaintiff. Id. ¶¶ 16-17.

### 4. The Army Exhausted Additional Locations in an Effort to Locate All Documents Potentially Responsive to Plaintiff's FOIA Request.

The Army engaged in a comprehensive effort to locate any and all responsive records to Plaintiff's FOIA request. Additional offices were involved in locating information and documents responsive to Plaintiff's FOIA request: Space and Missile Defense Command (SMDC); Army Contracting Command (ACC FOIA); Aviation and Missile Command-FOIA (AMCOM-FOIA); Army Testing and Evaluation Center (ATEC) at Aberdeen Proving Ground,

and Headquarters, Department of the Army FOIA (HQDA-FOIA). Def. Exh. I, Allen Decl. ¶¶ 7-9; Def. Exh. K, Lopez Decl., ¶ 5; Def. Ex. J, Bolling Decl., ¶¶ 4, 5.  The HQDA FOIA office noted that it did not have responsive records and referred the request to Aberdeen Proving Ground and SMDC.  Def. Ex. J, Bolling Decl., ¶¶ 4, 5.  Upon its receipt, the Aberdeen Proving Ground FOIA office made a good faith determination that it was not likely to have responsive records that that it was not the appropriate custodian of the records requested.  Def. Exh. K, Lopez Decl., ¶ 5.  The Headquarters United States Test and Evaluation Command, Aberdeen Proving Ground, manages headquarters functions of the agency specific to planning, scheduling, executing tests, and evaluating data from those tests.  *Id.* ¶ 3.  Plaintiff's request was referred to the Program Executive Office, Missiles and Space, JLENS Product office.  *Id.* ¶ 7.  The SMDC FOIA office also did not have any responsive documents and referred the request to ACC.  Def. Exh. I, Allen Decl. ¶ 7.  Army Contracting Command did not locate any documents responsive to Plaintiff's FOIA request and referred Plaintiff's FOIA request to AMCOM FOIA and Army Contracting Command-Redstone Arsenal.  *Id.* ¶ 8.  The AMCOM FOIA office did not locate any responsive records following its search for information.  *Id.* ¶ 9.

The Army took appropriate efforts to locate the offices likely to contain information regarding the JLENS project.  Additionally, multiple offices conducted thorough and adequate searches in an effort to locate documents responsive to Plaintiff's FOIA request.  These offices searched physical files and electronic databases.  Moreover, the Army followed up on leads when possible and expanded its search when necessary in an effort to locate all records responsive to Plaintiff's FOIA request.  The Army' search was reasonably calculated to uncover all relevant documents, *Weisberg*, 705 F.2d at 1351, and it exerted "a good faith effort to conduct

a search for the requested records using methods which can reasonably be expected to produce the information requested." *Oglesby*, 920 F.2d at 68.

### C.      The Army's Withholdings Were Appropriate

As a result of its efforts, the Army located 5632 pages of responsive material to Plaintiff's FOIA request.  Def. Exh. A, AR 36-39; Def. Exh. I, Allen Decl., ¶ 25.  Of these materials, 5552 pages were fully or partially released to Plaintiff with applicable FOIA Exemptions claimed.  *See* Def. Exh. C, JLENS Vaughn Index; Def. Exh. F, JLENS Procurement Contracts Vaughn Index, Def. Exh. H; JLENS Engineer Services Contract Vaughn Index; Def. Exh. B, Howard Decl., ¶¶ 11, 14a, 14d; Def. Exh. I. Allen Decl., ¶25.  Only four documents comprising eighty pages were entirely withheld because they contained classified information or other information protected entirely from release by statute.  Exh. B, Howard Decl., ¶¶ 11, 14a, 14d; Def. Exh. I., Allen Decl., ¶ 25.

In accordance with Exemptions authorized by the FOIA, the Army withheld certain information from the documents provided to Plaintiff.  After careful review, it was determined that many of the documents contained classified information and that information was withheld pursuant to FOIA Exemption 1.  Other documents were found to contain information protected by Federal statutes that prevent disclosure of information with military or space applications, which is not authorized to be exported lawfully outside the United States without an approval, authorization, or license under the Export Administration Act; thus, this information was withheld pursuant to FOIA Exemption 3.  Because many of the documents located are contract documents that contain trade information or other financial data submitted by defense contractors, these documents were reviewed for commercial information protected from

disclosure through FOIA exemption 4.  Further the FOIA office at Redstone Arsenal contacted

the appropriate contractors, Raytheon and deciBel Research, for their input regarding what, if

any information they believed should not be released and made the appropriate withholdings.

Further, personal data protected from disclosure was withheld pursuant to FOIA exemption 6.

Lastly, the documents identified for release further contain other sensitive information that

release of would subject persons working on the JLENS project to potential harassment or harm,

and whose release would further allow adversaries to circumvent the protections afforded by the

JLENS system.  Accordingly such information was withheld pursuant to FOIA Exemption 7(E).

   1.    **Exemption 1**

   The Army withheld records in full or in part that are classified "SECRET," or

"CONFIDENTIAL," within the meaning of Executive Order 12958 as amended by Executive

Order 13292.  The information withheld was properly classified, and the withholdings are

consistent with the principles underlying Exemption 1.  Def. Exh. B, Howard Decl. ¶ 19; Def.

Exh. D, Thurgood Decl. ¶¶14, 15, 16, 17, 19.  The exemption "provides that the disclosure

provisions of the FOIA do not apply to matters that are '(A) specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense or foreign

policy and (B) are in fact properly classified pursuant to such Executive order.' 5 U.S.C. §

552(b)(1)."  *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1123 (D.C. Cir. 2007); *see also*

*Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).  Each

document withheld under Exemption 1 is identified in the *Vaughn* Indexes attached hereto, along

with a description of the document as well as the classification applicable to the document.  *See*

Def. Exh. D, Thurgood Decl., ¶¶ 11-22; Def. Exh. D, Thurgood Decl., Attachment 1, JLENS

Vaughn Index of Classified Information; Def. Exh. C, JLENS Vaughn Index.

As discussed more fully in the accompanying declarations, these documents are currently

and properly classified CONFIDENTIAL or SECRET, the unauthorized disclosure of which

could reasonably be expected to result in damage, serious damage, or grave damage to the

national security.  *See* Def. Exh. D, Thurgood Decl., ¶¶ 20-22.  As noted by Brigadier General

Thurgood in his declaration, release of the information withheld would reasonably be expected to

disrupt the JLENS mission to provide persistent protection against cruise missiles, manned and

unmanned aircraft, tactical ballistic missiles, large caliber rockets and surface moving targets.

*Id*. ¶ 21.  Further, publication of JLENS capabilities would provide information to potential

adversaries that could be exploited, because of the system's technological value, and cause

significant harm to both the system and military and civilian personnel with access to the

information.  *Id*. ¶ 22.

The declaration submitted by Brigadier General Thurgood provides ample information

demonstrating that release of the classified information currently withheld in accordance with

Exemption 1 would cause harm to national security.  As an initial matter, Brigadier General

Thurgood is an original classification authority pursuant to Executive Order 12958 as amended,

and he is authorized to conduct classification reviews and to make original classification and

declassification decisions.  *Id*. ¶ 2.  Brigadier General Thurgood reviewed the documents and the

information identified to be withheld and determined that the information withheld fell within

the administrative requirements of Section 1.1(a) of Executive Order 12958, as amended.  *Id*. ¶¶

10, 12, 13, 14.  Additionally, Brigadier General Thurgood reviewed the information identified to

be withheld and confirmed that it was currently and properly classified pursuant to Executive Order 12958. *Id.* Noting that serious harm to national security could result from the release of the information because a release of the information would reveal insight into JLENS technology and the capabilities of the system, Brigadier General Thurgood determined that the information was appropriately classified. *Id.* ¶¶ 14, 15, 16, 17, 18, 19, 20, 21, 22.

Of the eight classification categories listed in Section 1.4 of Executive Order 12958, as amended, one is relevant to the documents withheld by the Army in this case. Section 1.4(g) protects information regarding the "vulnerabilities or capabilities of systems . . . relating to the national security." 75 Fed. Reg. at 708. The D.C. Circuit explained that "Exemption 1 in this way establishes a specific exemption for defense and foreign policy secrets, and delegates to the President the power to establish the scope of that exemption by executive order." *Military Audit Project v. Cassey*, 656 F.2d 724, 737 (D.C. Cir. 1981). Because of the significance of classified information, courts are particularly respectful of classification decisions by the executive branch, and classification decisions are entitled to "substantial weight." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009); *Weissman v. Cent. Intelligence Agency*, 565 F.2d 692, 697 n.10 (D.C. Cir. 1977). Further, courts should not substitute their judgment for that of the executive with respect to classified information. *See Halperin v. Cent. Intelligence Agency*, 626 F.2d 144, 148 (D.C. Cir. 1980) ("Judges, moreover, lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case."). Accordingly, courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. For Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003); *Larson*, 565 F.3d at 865 ("Today we

reaffirm our deferential posture in FOIA cases regarding the uniquely executive purview of national security") (internal marks and citations omitted).  The Court stated, moreover, that "[i]f an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise, . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions."  *Id.*  As Defendants have satisfied this standard, the Court should uphold their withholding of records under Exemption 1.

2.      **Exemption 3**

Exemption 3 exempts from disclosure material that is "specifically exempted from disclosure by statute," thereby incorporating the protections of other shield statutes.  5 U.S.C. § 552(b)(3).  In this proceeding the Army has invoked various statutes that require the non-disclosure of specified information.  The sole issue for decision "is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Morely*, 508 F.3d at 1126.

For its Exemption 3 withholdings, the Army relied upon 10 U.S.C. § 130; 22 U.S.C. § 2778; 22 U.S.C. § 2751 *et seq*; and 22 C.F.R. § 121.  Def. Exh. B, Howard Decl., ¶¶ 22, 23, 24. 10 U.S.C. § 130 provides that "notwithstanding any other provision of law, the Secretary of Defense may withhold from public disclosure any technical data with military or space application in the possession of, or under the control of, the Department of Defense, if such data may not be exported lawfully outside the United States without an approval, authorization, or license under the Export Administration Act."  10 U.S.C. § 130(a).  The statute further provides

that "technical data may not be withheld . . . if regulations promulgated under either Act authorize the export of such data pursuant to a general, unrestricted license or exempted in such regulations." *Id.* Technical data with military or space application is defined by the statute to include "any blueprints, drawings, plans, instructions, computer software and documentation, or other technical information that can be used, or be adapted for use, to design, engineer, produce, manufacture, operate, repair, overhaul, or reproduce any military or space equipment or technology concerning such equipment." *Id.* The United States Munitions list, codified at 22 C.F.R. § 121, compiles a list of defense articles and services whose import and export are regulated. Category XI, of the United States Munitions list covers "[e]lectronic equipment . . . specifically designed, modified, or configured for military application." 22 C.F.R. § 121.1, *Category XI—Military Electronics* (a). The code section covers radar systems with capabilities including, acquisition, tracking, moving target indication, imaging radar systems and any ground air traffic control radar specifically designed or modified for military application. *Id.* (a)(3); Def. Exh. B, Howard Decl. ¶ 22. Items covered by this section are not authorized to be exported outside the United States without an approval, authorization, or license under the Arms Export Control Act. 22 U.S.C. § 2778(a)(1); Def. Exh. B, Howard Decl. ¶ 22.

Pursuant to the statute, the Army withheld information pertaining to the technical specifications included in the JLENS Performance Specification, the three JLENS Interactive Electronic Technical Publications, the JLENS Performance Specification for Spiral 1, and the JLENS Prime Item Development documents. Def. Exh. I, Allen Decl., ¶ 37; Def. Exh. B, Howard Decl., ¶¶, 23-28. Each of these documents is covered by an Export Control Warning, under 10 U.S.C. § 130, that authorizes the government to "withhold from public disclosure

21

certain technical data." Def. Exh. I, Allen Decl., ¶ 37. The Export Control Warning signals that the documents contain technical data that is restricted from release. *Id*. The documents are marked "Distribution Statement F" and such markings prohibit distribution without authorization from the controlling Department of Defense office. *Id*.

The withheld portions of the documents pursuant to FOIA Exemption 3 discuss technical data related to a military radar system. Def. Exh. B, Howard Decl., ¶¶ 23, 25, 26, 27. The JLENS system provides persistent radar surveillance and tracking capabilities of unmanned aerial vehicles and provides cruise missile defense. Def. Exh. D, Thurgood Decl., ¶¶ 23, 25, 26, 27. Specifically, the JLENS uses advanced radar and network technology to provide wide-area surveillance and precision target tracking. *Id*. Through this technology, the JLENS provides fire control data to fighter aircraft so that they can engage hostile threats from extended range. *Id*. The information withheld from the performance specifications and contract documents concerns technical data with military application and military electrical systems. Def. Exh. B, Howard Decl., ¶¶ 23, 25, 26, 27. The information describes the interface, performance, functional requirements, and operating environment of the JLENS systems. *Id*. None of the information withheld has been released pursuant to a general, unrestricted license nor is it covered by any exemption for release found within the export control regulations. *Id*. Accordingly, the information regarding military technical data was appropriately withheld pursuant to FOIA Exemption 3.

### 3.    Exemption 4

The Army withheld confidential business information submitted to it by Raytheon and deciBel Research pursuant to Exemption (b)(4). FOIA Exemption (b)(4) prohibits disclosure of

"trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  The terms "commercial" and "financial" are given their ordinary meanings.  *See Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). "Commercial" is defined broadly to include "records that reveal basic commercial operations or relate to income-producing aspects of a business" as well as situations where the "provider of the information has a commercial interest in the information submitted to the agency."  *Baker & Hostetler, LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (internal quotation marks omitted).  Whether commercial or financial information is protected turns in part on whether it was provided to the government voluntarily or under compulsion.  If the financial or commercial information was disclosed to the government voluntarily, it will be considered confidential for purposes of Exemption 4 if it is the kind of information "that would customarily not be released to the public by the person from whom it was obtained."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992).  If the information was required, however, it will be considered confidential only if disclosure would be likely either (1) "to impair the government's ability to obtain necessary information in the future"; or (2) "to cause substantial harm to the competitive position of the person from whom the information was obtained."  *See id.* at 878-84 (reaffirming and quoting test of *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), but confining it to cases of compelled disclosure).  Additionally, information exchanged within the context of settlement negotiations and otherwise commercial and sensitive in nature may be properly withheld under Exemption (b)(4).  *M/A-Com Info. Sys., Inc. v. U.S. Dept. of Health & Human Services*, 656 F. Supp. 691, 692 (D.D.C. 1986) (applying settlement privilege under

23

Exemption 4 for documents indicating certain accounting and other internal procedures the defendant was willing to undertake to obtain by consent dismissal without admission of liability or resolution of the facts in dispute).

Raytheon and deciBel Research, each were required to submit commercial and financial information during the contracting process.  Def. Exh. E, Ashley Decl., ¶ 15; Def. Exh. G, Vickerstaff Decl., ¶ 25.  Executive Order 12,600 and Army Regulations requires that the Army must notify and provide those who submit information when soliciting a contract an opportunity to object to the disclosure of the submitted information.  *Id*. ¶ 16.  The Army indeed provided the requisite notice to Raytheon and deciBel Research.  *Id*. ¶¶ 17, 18, 19.

Raytheon reviewed its contracts maintained by Army Contracting Command-CAMO and submitted responses for each contract.  *Id*. ¶¶ 17, 18.  It voiced its concern that it would suffer competitive harm if information regarding its pricing, schedules, proprietary approach to the JLENS program, or other information were released.  *Id*.  Raytheon submitted recommended withholdings to the Army.  *Id*.  Specifically, Raytheon requested that its line item pricing, cost, profit, funded amount, incentive fee share ratios, and other pricing data be withheld from disclosure.  *Id*.  Raytheon contended that by providing insight into its pricing would present a significant risk for its business and provide an unfair advantage to its competition in further procurement actions.  Def. Exh. E, Ashley Decl., ¶ 17.  The Army independently reviewed Raytheon's recommendations and determined that information related to fee and fee ratios and Raytheon's proposed pricing should be withheld.  *Id*. ¶ 18.  However, the Army disagreed that line item prices or total contract prices should be withheld as this information described only what the government was willing to pay and reflected the negotiated total price.  *Id*.  Ultimately,

the Army withheld information concerning negotiated and funded cost and fee information, number of hours and prices, incentive ratios, subcontract costs, direct productive person hours, flat spot/zone incentive and performance criteria, remittance information, proposal assumptions, property dollar values, and similar contract data.  *Id.*

Raytheon also reviewed its contract maintained by Army Contracting Command-AMD. Def. Exh. G, Vickerstaff Decl., ¶ 26.  Initially, Raytheon proposed withholding information regarding line item pricing, cost, profit, funded amounts, fee percentages, and other pricing aspects.  *Id.*  The Army reviewed Raytheon's response and determined that the Contract Line Item Number (CLIN), SubCLIN and total funding pricing did contain information that disclosure of would competitively harm Raytheon because the information contains competitively sensitive information.  *Id.* ¶ 27.  The Army determined that disclosure of the information would provide Raytheon's competitors insight into Raytheon's estimated cost, number of hours and level of effort and that release would allow competitors a base from which to compute their proposals. *Id.*  Moreover, the Army determined that disclosures protected Raytheon's proprietary approach to the JLENs program and competitively sensitive trade secrets and data.  *Id.*  Accordingly, this information was withheld under Exemption 4.

Similarly, deciBel Research reviewed its contracts maintained by Army Contracting Command-CAMO and initially objected to the release of total contract price as well as cost and fee breakdowns.  Def. Exh. E, Ashley Decl., ¶ 30.  After coordination, deciBel Research modified its position and agreed that total contract values could be released, but maintained its position that cost and fee amounts at the CLIN level should not be disclosed.  *Id.* ¶.  It contended that disclosure of this information would cause it competitive advantage to future competitors by

apprising them of deciBel Research's item costs were for the non-commercial development it has

undertaken. *Id.* The Army agreed that disclosure of the item cost information, to include

negotiated and funded cost and fee information, direct productive person hours, dollar value of

equipment of a sensitive nature, property dollar values and other similar contract information

would harm deciBel Research's competitive position and appropriately withheld the information

pursuant to FOIA exemption 4.

### 4.     Exemption 6

Exemption 6 of FOIA allows agencies to withhold "personnel and medical files and

similar files the disclosure of which would constitute a clearly unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(6). To make the determination of whether the release of a file

would result in a clearly unwarranted invasion of personal privacy, courts balance the private

interest involved "against the public interest (namely, 'the basic purpose of the Freedom of

Information Act,' which is 'to open agency action to the light of public scrutiny')." *Horowitz v.

Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005) (quoting *Dep't of the Air Force v. Rose*, 425

U.S. 352, 372-73 (1976) (internal quotation marks omitted)). "The focus of the public interest

analysis is the citizens' right to know 'what their government is up to.'" *Id.* (quoting *U.S. Dep't

of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citations

omitted)); *see also Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (stating that

the standard from Reporters Committee "is applicable in the case of Exemption 6"). As a release

under FOIA makes information "publicly available," *see id.*, neither "'the identity of the

requesting party' nor 'the particular purpose for which the document is being requested' is

relevant." *Id.* (quoting *Reporters Comm.*, 489 U.S. at 771-72.

"If there is no public interest in the disclosure of certain information, 'something, even a modest privacy interest, outweighs nothing every time.'" *Id.* (quoting *Nat'l Ass'n. of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989). Further, "[e]ven seemingly innocuous information can be enough to trigger the protections of Exemption 6." *Id.* at 278. As the D.C. Circuit discussed in *Horowitz*, the Supreme Court has held that Exemption 6 "shielded the names and home addresses of agency employees from being released to unions that requested the lists under FOIA." *Id.* (discussing *United States Dep't of Defense v. Fed. Labor Rel. Auth.*, 510 U.S. 487, 502 (1994)). Additionally, "as 'other parties, such as commercial advertisers and solicitors, must have the same access under FOIA as the unions'; releasing the lists to the unions would have necessitated giving other parties access as well." *Id.* (quoting *Fed. Labor Rel. Auth.*, 510 U.S. at 502). The Supreme Court thus held that that the privacy interests outweighed the "negligible" public interest at stake. *Id.* at 502; *see also Wood v. FBI*, 432 F.3d 78, 85-87 (2d Cir. 2005) (holding names of government investigators and third parties as well as subjects of administrative investigation may be withheld); *Appleton v. FDA*, 451 F. Supp. 2d 129, 145-46 (D.D.C. 2006) (upholding redaction of the names of drug company employees and information identifying interviewees and other individuals in investigation files pursuant to Exemption 6); *Concepcion v. FBI*, 606 F. Supp.2d 14, 35-39 (D.D.C. 2009) (upholding redaction of the names of third parties in investigative files under Exemption 6).

Here, the Army involved invoked Exemption 6 to withhold identifying information regarding individual employees and officials involved in reviewing them. Such information included names, telephone numbers, email addresses, signatures and other personal identifying data. *See* Def. Exh. G, Vickerstaff Decl., ¶¶ 29, 30. As the names and identifying information of

these individuals do not shed light on how the agency is performing its mission, there is no public interest to be served by releasing the identities of these individuals. Furthermore the individuals whose privacy information was withheld possibly are, in positions of access to sensitive or classified information, and therefore could become targets of harassing inquiries for unauthorized access to information, if their identities are released.  Def. Exh. B, Howard's Decl. ¶¶ 31, 32.

These persons maintain a strong privacy interest in this information because its release could subject them to harassment, embarrassment or unwanted contact.  *See e.g.*, Def. Exh. B, Howard Decl., ¶¶ 31, 32; Def. Exh. E, Ashley Decl., ¶¶ 32, 33; Def. Ex. J, Vickerstaff Decl., ¶¶ 29, 30.  Simply put there is no public interest that would be served by the disclosure of this information.  *See Am. Fed'n of Gov't Employees, Local 812 v. Broadcasting Bd. of Governors*, 711 F. Supp. 2d 139, 156 (D.D.C. 2010) (upholding redaction of names and other information relating to another individual pursuant to Exemption 6); *Govt. Accountability Project*, 699 F. Supp. 2d at 105-06 (concluding that agency properly redacted personal email addresses of applicants for board positions because "releasing their email addresses serves no public interest because these email addresses would not reveal 'what the government is up to'").  Indeed, courts have held that "[w]hile there may be some public interest in obtaining the identifying information of the Federal employees at issue, disclosure would not shed any light on the workings of [an agency]."  *Canaday v. U.S. Citizenship & Immigration Servs.*, 545 F. Supp. 2d 113, 118 (D.D.C. 2008).

Because there is no countervailing public interest that can overcome the privacy interest of these individuals, the agency properly redacted their identifying information pursuant to

Exemption 6.  *See Beck v. Dep't of Justice,* 997 F.3d 1489, 1494 (D.C. Cir. 1993) (finding that when there is no public interest at all, the court "'need not linger over the balance; something outweighs nothing every time'") (quoting *Nat'l Ass'n of Retired. Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)).

> **5.  Exemption B(7)(E)**

Under Exemption 7(E), a law enforcement agency may withhold "'records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.'"  *Blackwell v. F.B.I.*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting 5 U.S.C. § 552(b)(7)(E)).  In this Circuit, "'the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.'"  *Id.* at 42 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).  In fact, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'"  *Id.* (quoting *Mayer Brown*, 562 F.3d at 1194) (internal quotation marks and alterations omitted).

"Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law." *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 155 (1989) (emphasis in original). Accordingly, law enforcement includes "proactive steps designed to prevent criminal activity and to maintain security." *Elec. Privacy Info. Ctr.*, 777 F.3d at 522 (quoting *John Doe Agency*, 493 U.S. 145 at 155). In *Elec. Privacy Info. Ctr.*, the D.C. Circuit determined that a Department of Homeland Security Standard Operating Procedure that described a protocol for shutting down wireless networks during critical emergencies, was created to "prevent crime and to keep people safe" and that such intentions "qualified as law enforcement purposes." 777 F.3d at 523.

The JLENS program is designed to provide persistent radar surveillance and tracking capability of unmanned aerial vehicles and provide missile defense for the country. Def. Exh. D, Thurgood Decl., ¶ 7. Further, the program is being deployed in the National Capital Region in support of the national security. Def. Exh. B, Howard Decl., ¶ 34. Release of the limited information withheld would subject the program, which is aimed to protect national security from criminal threats by terrorists through airborne means, to the risk of circumvention. *See id*. ¶¶ 34, 35; Def Exh. G, Vickerstaff Decl., ¶ 32; Def. Exh. E, Ashley Decl., ¶ 35. The JLENS program is aimed to provide persistent defense of the nation, its infrastructure, and the population as a whole. Thus, it is apparent that the JLENS program is a "proactive step designed to prevent criminal activity and to maintain security." *See Elec. Privacy Info. Ctr.*, 777 F.3d at 522 (quoting *John Doe Agency*, 493 U.S. 145 at 155). The purpose of the documents and

contracts included in the release to Plaintiff is to establish a program to protect the nation from

the criminal threats posed by terrorists, and meets the threshold requirements for Exemption 7.

Once the agency meets the threshold requirement for the Exemption to apply,  7(E) only

requires that it demonstrate logically how release of the withheld  information might create a risk

of circumvention of the law.  *Blackwell*, 646 F.3d at 42 (citations omitted).  Further, although

discussing Exemption 7(F), the D.C. Circuit Court noted that an agency may withhold

information under FOIA, "for documents relating to critical infrastructure."  *Id*. at 523.

Here, the Agency has identified with specificity documents which if disclosed, would

subject individuals who work on the JLENS project to a palpable risk of potential violence or

coercion by criminals or hostile nations.  Def. Exh. B, Howard Decl., ¶ 33.  The risks to

individuals extend to the JLENS program as a whole, because if the personnel are compromised,

the security protections emplaced certainly would be compromised and the program put at risk.

Other documents from which the Agency withheld information pursuant to Exemption 7(E) were

created to protect identification of facilities and the information security requirements of those

facilities.  Def. Exh. B., Howard Decl., ¶ 34; Def. Exh. G, Vickerstaff Decl., ¶ 32; Def. Exh. E,

Ashley Decl., ¶ 35 (describing that a Department of Defense Form 254 was required to be

included in classified contracts and that the information in the form outlines security

requirements and classification guidance).  As noted in Colonel Howard's declaration, if the

facility requirements were publicized, adversaries could be apprised of factual information that

could be then used to circumvent protection mechanisms in place and cause harm.  Def. Exh. B,

Howard Decl., ¶ 35.  Further, disclosure of information regarding the facilities and security

mechanisms in place would subject government employees and defense contractors to

exploitation by foreign intelligence services or cause them to be targets of domestic terrorists or extremists. *Id*. ¶ 36.

The information in the documents that is withheld is principally aimed to prevent identification of the type of information employees have access to and the security requirements of the facilities where they operate. This type of information, if disclosed would create a risk that the procedures emplaced would be circumvented and both individuals working on the JLENS project and the JLENS project itself would be subject to great harm. Circumvention of the security procedures would imperil the JLENS mission as a whole, which is aimed to protect the nation from threats; thus, the information is exempt from FOIA pursuant to Exemption 7(E).

### 6.  All Reasonably Segregable Information Was Released

Under FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b).  "It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Although the agency "must provide a 'detailed justification' for its non-segregability," it "is not required to provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data*, 566 F.2d at 261). Here, it is readily apparent from the Vaughn indexes that the Agency conducted a line by line review of the documents produced and exempted only that information that was reasonably covered by an applicable exemption. Def. Exh. B, Howard Decl., ¶¶ 37-39. Indeed only four documents totaling eighty pages located during the agency's search were withheld in their entirety. Def.

Exh. D, Thurgood Decl., ¶¶12, 13.  For these documents, the JLENS Performance Specification Annex A was reviewed and it was determined by Brigadier General Thurgood that the unclassified portions of the document could not be released without revealing the classified nature of the document itself.  *Id*. 12.  He further noted that the information contained in the document would provide adversaries with sufficient data to change their tactics and thus neutralize the effectiveness of the JLENS program.  *Id*. ¶ 12.  Additionally, Brigadier General Thurgood described Annex B of the Fire Control Radar PIDS and Annex A and  B of the Communications Processing Group PIDS and the fact that they were fully withheld.  *Id*. ¶ 13. He noted that these documents revealed classified detection and tracking performance capabilities of the JLENS systems.  *Id*.  He further noted that revealing any of the information contained in the documents would provide adversaries with knowledge needed to neutralize the effectiveness of the JLENS.  *Id*.

The balance of the documents released by the Army demonstrates that it reviewed each document line-by-line to identify information exempt from disclosure or for which an exemption could be applied to ensure that all non-exempt information was released.  The Vaughn indexes and declarations provided clearly show that all information not exempted from disclosure pursuant to FOIA exemptions specified above was correctly segregated and non-exempt portions were released.  *See* Def. Exh. I, Allen Decl. ¶ 25(u).  Therefore, all segregable information has been released and Defendants are entitled to judgment as a matter of law.

## CONCLUSION

The Defendant has provided all responsive documents and properly withheld information authorized under FOIA.  Thus, the Defendant is entitled to summary judgment because there is no

genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.  For

the foregoing reasons, Defendant respectfully requests that the court grant judgment in favor of

the Defendant.

Respectfully Submitted,

VINCENT H. COHEN, JR,   D.C. Bar #471489
Acting United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

BY: _____/s/_____
WAYNE H. WILLIAMS
Special Assistant U.S. Attorney
555 Fourth Street, NW
Washington, D.C. 20530
(202) 252-2574
wayne.williams@usdoj.gov

*Attorneys for Defendant*